case number 19-6378 United States of America versus Shannon Hixon. Court argument is not to exceed 15 minutes per side. Mr Nash for the appellant. All right. Good morning, Mr Nash. Good morning, Your Honor. May it please the court and Miss Tessier. My name is Patrick Nash. I represent Shannon Hixon. And if the court please, I would like to reserve two minutes for you. Your Honor, my client was convicted of what is called a death results count out to of his indictment. It resulted in a mandatory life sentence. The United States versus Ewing. This court decided that in a death results conviction where the toxicology report indicating the substance in the decedent's blood does not match the evidence of what the and the evidence was insufficient and the conviction was reversed. The same applies in this case, Your Honors. Um, a man named Harvey Isaac sold the substance to the decedent, Mr Farber. Mr Isaac testified that he got the substance from my client, Mr Hixon. Mr Isaacs, however, was an addict who used both fentanyl and heroin, uh, they affected him differently, and he testified and confirmed in his texts confirmed that he had used the substance sold to Mr Farber. Uh, he confirmed it was heroin, not fentanyl. He very in some detail described the substance in his text messages. And when he talked to the police after the death of Mr Farber, he told the police the substance was heroin. When he went to the grand jury, he testified at the grand jury that the substance was heroin. Mr Nash. What time, in your view, did the Isaac to Farber transaction take place? Yes, Your Honor. That that transaction occurred, according to the testimony about 12 30 in the afternoon on the day of Mr Farber's death. Okay, and that's about the time that the other resident of the facility, Mr Wong, here's the water running in the bathroom where Mr Farber Farber was eventually fat, correct? Yes, sir. That's one of the times that he heard the water running. He actually testified hearing the water running twice once then and then. Well, I mean, isn't it fair to say it appeared to have been, you know, running the whole time, and that's why he got alarmed. Well, there was no there was no testimony in between those two times about water running. But most importantly, there was evidence that Mr Farber was being alive by his roommate much later in the day between 3 12 and 4 12. Okay, but isn't it true that, um, Mr Farber was found standing over the sink in that bathroom with the water running with rigor mortis at the time he was found in the yesterday? That's right. I mean, doesn't that allow a jury to conclude that, uh, he died from whatever he injected at 12, you know, around 12 30, the time of the sale from Isaac. Well, there's two layers to that question, Your Honor. I would say no. And here's the reason why I would say no, because number one, he the proof is insufficient that my clients sold the fentanyl. We know for sure from the toxicology that the his blood at the time of his death, there was not heroin in his blood. All of the evidence points to the fact that my client sold heroin, not fentanyl. And so if it is presumed and we argue that the fentanyl that there's not enough evidence of the fentanyl causes death. But if for purposes of your question, if we assume that fentanyl caused his death, the lack of the proof is that my client didn't sell the fentanyl and the timing of the death. The rigor mortis testimony was approximately two hours. In other words, the E. M. T. Said that rigor mortis sets in with within about two hours of death. The E. M. T. Was there at about 6 15, a little after six. So that would have pushed the time of death back to a little after four in the afternoon, which is when he was seen alive and about the same time he last used his cell phone. It was what time in your view on the cell phone. The last call from his cell phone, according to the testimony, was at 3 51 p.m. Okay, so so that corresponds with with the time that the roommates saw him alive between 3 12 and 4 12 p.m. And it also corresponds with the rigor mortis testimony from the E. M. T. So we have a gap of over three hours between the So again, for both of those reasons, and so we don't believe the evidence is adequate, is completely inadequate. As a matter of fact, that fentanyl was the substance sold by Shannon Hickson. And then in regards to the cause of death, which Hickson never opened the package right that is handed to him by Mr. I'm sorry, Isaac never opens the package that is handed to him by Mr Hickson, right? That was the testimony. Yes, sir. And no, I mean, how? I mean, if the jury rejects, chooses to reject the timeline that you described and adopts the timeline that he buys drugs at 12 30, which he injects, dies while he's injecting them basically at 12 30 is in there with the water running all day. Um, fentanyl residue everywhere. Um, I mean, Isaac hasn't opened the package. Why can't the jury conclude that that packet package actually did have that? No, well, it would. It would be total supposition for the jury to conclude there wasn't any evidence. I mean, that's a theory, but it's a theory without any evidence to support it. And in regards to the packaging, Mr Isaac testified that the packaging that he remembers delivering was not a clear package and the packaging. So under the scenario, your honor have proposed Mr Farber would have immediately gone inside, immediately unpackaged the drug, immediately used the drug and immediately died. The packaging found at the scene of death was a clear cellophane package. And Mr Isaac testified that the package he delivered was not a clear cellophane package. And so again, the evidence, the idea that it was something different is there's just no evidence to support that your honor. Um, in regards to the cause of death, I'll touch on that briefly. We've got no medical testimony, no autopsy. And we have a toxicologist who said in the end that but for the presence of fentanyl, survival would have been possible. That was his ultimate conclusion. He disavowed giving an absolute cause of death. Survival. He had a foam cone, right? I'm sorry. He was found with a foam cone. Yes, sir. Right. I mean, which is just a hallmark of a fentanyl overdose, right? That's one of the explanations. The toxicologist. I mean, just speaking strictly for myself here. I mean, your more interesting arguments might be the deficiency and also the sentencing. The 8 41 argument. Yes, sir. I will move to that immediately. So in regards to the sensing argument, your honor, we've got a situation post first step act where under 8 41 B one, a person who has no prior serious drug felony who traffics in 400 grams of fentanyl, 40 grams of fentanyl, 1000 grams of fentanyl and causes the death. That person receives a 20 year mandatory minimum sentence. But my client in the same position, except for the fact that he trafficked in half a gram of fentanyl, is subjected to a mandatory life sentence. Mandatory minimum life sentence. Go ahead. The person who's trafficking in those large amounts can also be charged under subsection C and be in the same situation as your what? Well, theoretically, but think of think of the dilemma that that then creates. At that point, does the client who has trafficked in 400 grams of fentanyl and is charged under under B one C seek a B one a lesser included offense? Because based on the idea that no, I trafficked in 400 grams and I want the lesser included offense that only has a 20 year, uh, mandatory minimum rather than a life mandatory minimum. It's it turns the whole to view it that way and have the government charge everybody that way turns the whole sentencing structure upside down. The idea of graduated punishments for people dealing in larger and larger amounts of drugs is one of the bedrock principles of the drug sentencing scheme. But it's not a constitutional principle. I mean, you're really swinging for the upper deck here to say that this violates the United States Constitution. Well, I'm certainly arguing under the lowest sort of analysis under an equal protection due process analysis. But what I have to convince the court is that this sentencing scheme is not related to any legitimate legislative purpose, and it's therefore arbitrary. And all of the case law surrounding drug sentencing is what I just said. Proportional sentencings for defendants who deal in traffic and more and more drugs. And there's just no rational reason why a half gram trafficker is sentenced so much more severely than a 400 gram trafficker. Well, they're both probably gonna get life. You know, if you kill somebody, basically, you're gonna get life. The different the felony predicates are different. I mean, the prior felony conviction got serious drug offense. You got felony drug offense for whatever reason. I mean, that's those aren't identical Venn diagram. So there are some differences there. But well, go ahead. Okay. What about the whether the offense qualifies as a predicate? Yes, Your Honor. So so it does not. And the reason why is that the offense, which, by the way, was 0.9 grams of cocaine trafficking. Um, under Kentucky law under the Kentucky statute, that statute allows convictions for analogs, which Kentucky defines is basically can be fake substances. Um, the federal definition for felony drug offense does not include analogs, does not include fake substances. Well, okay. But this the analogs is not fake substances under Kentucky law, right? It's drugs that are substantially similar to stimulants, depressants, hallucinogenics. Fair. Well, there's actually multiple death. There's multiple subsections to the analog definition of Kentucky. I don't see anything about the fake drugs there. You so so the language that I'm tracking in a controlled substance analog that is defined as a substance that a person represents to have a stimulant, depressed or hallucinogenic effect. That's 2 18 a.010. Um, so all that is required. Okay, I thought the 1412. Am I wrong about that? Your honor, I'm looking at the 2004 version that was in effect at the time of the conviction. It was in the out in the records. It's 2 18 a. 010 subsection five subsection a subsection three. Oh, yeah. All right. Um, I guess I got a little lost in Kentucky statute here. I mean, one thing I want to point out is that, um, 802 9. Um, defines depressant or stimulant stimulant substance for purposes of 802 44. And that's that seems to sweep, uh, broadly enough to pull in analogs. Well, if your honor, I don't have that definition. I don't know that definition was brief, but I would say that unless it encompasses fake substances, uh, totally fraudulent fake substances, my argument would be that it is. It is not as broad as the Kentucky definition. Okay, well, that's that's helpful to know that. Um, that's your argument. I see that I'm out of time. Your honor. Thank you. Anybody? Judge White. Anything else? All right. Thank you, Mr Nash. You'll have your rebuttal here from the government. Yes, sir. May it please the court. Phenola Tessier on behalf of the United States morning. I'd like to start, if I may, just with a couple of factual issues. Um, defense claims that the last phone call from Mr Farber's phone was at 3 51 p.m. Um, the record is actually not so clear at page 25 of the appendix. I believe that's where this information is coming from. It indicates when Mr Farber's phone was active, and it says the last call was at 3 51. But it does not indicate. What does that mean? Active for my understanding? You know, that means that it pinged to a cell phone tower, which means that something came in or went out. And so, um, it is not a record of a call. I'm sorry, your honor. It's not a record of a call. In your view, that it is. It is a record of a call, but it is not a record of a call that was made. So it could be an incoming. That's correct, your honor. That's my understanding. And it may be that there's somewhere else in the record. But that is where I see in the record that reference to 3 51 is on page 25 of our appendix. Um, secondly, as to rigor mortis, the testimony is that it takes two hours for rigor mortis to set in. Not that two hours previously was the time of death. And, of course, rigor mortis doesn't disappear after a minute. And so that only means that Mr Farber died at least two hours before he was found. Not that he died precisely two hours before he was found. Um, on Mr Hickson's argument about Section 8 41. Um, I would note that Chapman forecloses any argument that it is unconstitutional to treat differently situated defendants the same way under a 8 41 B one C. And since this is what's Chapman again? Um, Chapman is cited in our brief. It's I forget how old it is, but it is a It is a case about LSD weight and whether LSD weights in the sentencing structure are dependent on the weight in the carrying mechanism. Um, and we have a on the analog, uh, substances. The definition of controlled substances analog in Kentucky is virtually identical to the definition of controlled substance analogs in the federal controlled substances statute. But I mean, the virtually part could be the problem. I mean, I'm sorry. The virtually part of what you just said could be the problem. I mean, in other words, it may not be actually. And Mr Nash says that this to a to 18 a point 010 Kentucky definition brings in fake drugs because it includes drugs that a person represents. Um, or cells represents to have a certain effect and I guess why doesn't that bring in fake drugs rather than, uh, drugs that are actually substantially similar? So that is that language is in the federal definition of a controlled substance analog as well. Where is that? That's in 21 U. S. C. 802 32 is the definition of controlled substance analogs. Um, and yeah, but that's okay. But the problem you have there is 804 80 to 44 does not use that term correct. It uses narcotic. It chooses for whatever reason to spell out specific controlled substances rather than talk about quote controlled substances. That's right, Your Honor. But if defendants interpretation is correct, then that means that the federal controlled substances statute is definition because the same argument that applies to the Kentucky controlled substances definition, which is that includes analogs which are defined to include with substances with respect to a particular person, um, uh, is represented or intended to have a stimulant, depressant or hallucinogenic effect there. That language that I'm reading, that's from the federal definition of a controlled substance analog, and that same language is in the and as we pointed out in our brief, if defendant is correct, then that means that the federal controlled substance statute is over brought. Now, defendants response to that is that the federal statute is different because the federal statute expressly defines a controlled substance to include a controlled substance analog. And he points to 21 U. S. C. 8 13. Of course, the exact same thing is true for the Kentucky statute. It just does it a slightly different way. It does it in the definitional provisions instead of in a separate statute. Um, I'd point you to the P. S. R. Actually, um, the P. S. R. Has the 2004 version of the Kentucky statute in it. So that's the easiest place to look for the language and a page 707 of the P. S. R. Um, number four. So this is the definitional provision for Kentucky. It's, uh, 218 a point 010 definitions for this chapter and definition for says a methamphetamine or a drug or substance immediate precursor to a scheduled drug and includes a controlled substance analog. So the exact same treatment in the federal statute is controlled substance analog are considered controlled substances. And the same thing is true with Kentucky. So there's no daylight between the Kentucky statute. Uh, I understand. But is that what we should be comparing? Isn't the question. What is the definition of a prior felony drug? That's correct, Your Honor. It is. And the question that includes analog substances. So a felony drug offense is defined as a statute that prohibits conduct relating to narcotic drugs. And this court setting Grayson that the phrase relating to is very broad. The question is, is the conduct does it broadly relate to? And a controlled substance analogs are defined by their relationship to controlled substances. But as the Second Circuit pointed out, what has to have this relate to is the conduct. It's conduct relating to draw, you know, narcotics, marijuana, etcetera. It's not the drugs that have to have a relationship. The conduct must have a relationship with these drugs. I think Mr Nash's point is that those drugs are overbroad. And so we're talking about conduct relating to things that fall outside of the federal statute. Well, I would argue that selling a drug while selling something while representing that it is a controlled substance is conduct relating to a controlled substance. Um, so the Second Circuit case, Mr Nash cites a case in Savage, which is not about the felony drug offense definition. It's about the controlled substances offense definition in the guidelines, which is somewhat different. He does cite to Brown, which is an Eighth Circuit case. He cites that in his reply brief for the first time. And that involved the Iowa simulated substances statute. Now, the court in Brown found very crucial and central to their decision. The fact that Congress had never outlawed simulated substances and the definition of simulated substance, which they give in that opinion, is broader than the definition of a controlled substance analog. Um, it is, uh, includes something not expressly represented to be a controlled substance, but something simply impliedly represented to be a controlled substance that because of its nature, packaging or appearance would lead a reasonable person to believe it to be a controlled substance. But I mean, if if if the Eighth Circuit in that case accepted your argument that when somebody represents that the substance is cocaine, that's conduct relating to cocaine. Um, the Eighth Circuit would have come out the other way if they adopted your argument. I don't call that not necessarily your honor. And that's because the Iowa simulated substances definition is broader than the controlled substance analog definition in either the Kentucky or the federal statute. And the Brown court found very important to its decision. They said Congress had never outlawed the sale of simulated substances, right? But I don't. But, you know, if if it's a simulated substance, isn't the person representing that it's cocaine or heroin or something? No, your honor, not according to the death, not necessarily according to the definition of in Iowa. And that is because it only requires an implied representation that is because of the nature, packaging or appearance, a reasonable person would believe it to be a controlled substance. And so there's a difference in men's rare requirement there. It doesn't require that same representation. And I think that it is important to look at that part of Brown where they talk about whether or not Congress has outlawed simulated substances. Congress has, of course, outlawed analogs and has since 1986. And Brown goes through the whole history of the adoption of the felony drug offense definition. And it says talks about how the current formulation was adopted in 1988, which is after the adoption of the Federal Analog Act and was put into at some point in the 90s, was put into the definitional provision and says it's very important to note Congress has never outlawed simulated substances. And it must be because they are defining stimulated substances to be broader than controlled substance analog, because, of course, at that time, controlled substance analogs were outlawed by Congress. And so that's the difference between the Iowa statute and the Kentucky statute at issue here. Of course, the court needn't address any of this, both because the statute is divisible, but also because even if the life sentence were not mandatory, the district court was very clear here that regardless of whether or not the life sentence was mandatory, the court would have imposed that sentence. I've got a question. I understood the court to say that I think what the court said, whether it's 360 life or life, I think it's 240 to 289 or something like that. What was the judge referring to? I think the judge was, so the statutory maximum is 240 months if there was no death resulting. Assuming there is death resulting, the range is 20 years to life. With both death resulting and a prior felony conviction, then the mandatory minimum sentence is life. So I think what the judge was saying is if he did not have a prior felony, but just had the death resulting, and then the range were not, the mandatory sentence were not life, I would still impose a life sentence. Okay, so he wasn't referring to, there was no reference to what the guidelines would have been had he not had the predicate offense. So, Your Honor, the guidelines would be the same even if the predicate did not count as a prior felony drug offense under the statute. And that's because the guidelines define predicates slightly differently. So the relevant guideline here is USSG 2D1.1. Sorry, it's what? 2D1.1. Yes. And it says if death results and the defendant has a conviction for a similar offense, then the guidelines range is life. And Mr. Hickson. The same definition, right? Don't you use the same definition for similar offense? I don't. I'm not aware of anything that says that you use the same definition for similar offense as you do for a prior felony drug offense. No. And Mr. Hickson, importantly. Go through a categorical analysis again. Well, Mr. Hickson, if Mr. Hickson had argued that, it would be waived. Mr. Hickson did not challenge the guidelines analysis in this case. He only challenged the application of a mandatory life sentence. And I think it is hard to argue that Mr. Hickson's prior conviction for trafficking cocaine, which was a first-degree drug trafficking conviction, is not a similar offense. But the judge said even if there were a different guidelines calculation, and to be clear, Mr. Hickson is not arguing on appeal now that the The guideline range, just to be clear, is a point, correct? Life? Yes, that's correct. That's correct. Under 2D1.1, the guidelines range is life. He did not challenge that in this report. Yes, but that's only if he has the prior felony drug conviction. No, Your Honor. I don't believe that's correct. That is only correct if you define the phrase similar offense to be precisely the same as prior felony drug offense. And that actually doesn't make all that much sense in the context of the current statutory scheme because, of course, the predicates under B1A and B1B are defined differently than the predicates for B1C. But it is the same guideline for all three of those convictions. It just says that. Did the PSR have a guideline range of life? Yes, it did, Your Honor. Okay. Did he object to that? He did not, Your Honor. He objected to the determination that he had a prior felony drug offense. That's right. He objected to the... He said it is incorrect to say that there is a mandatory minimum of life. But he did not say it is incorrect to say that my guidelines is life, which is a different objection. They are different definitions. They can't be the same definition, again, because USSG 2D1.1 references... It does not use the same language. It does not say prior felony drug offense. It just says similar offense. Well, I think there are cases that say it is the same. Well, in any event, the District Court here said that... I mean, this is not an argument that Mr. Hickson himself is making, but also the District Court here was clear that even if the guidelines range were not life, the court believed that this was the appropriate sentence. And there's no dispute that so long as this court upholds the death-resulting conviction, that it is within the statutory range. During that part of the sentencing hearing, the judge said, even if we were in a range of not less than 20 years, nor more than life, a life sentence would be appropriate and would be imposed because it's the correct sentence. Is 20 years the statutory minimum with a death resulting? That's correct, Your Honor. I believe that's referring to the 20 to life that is the statutory range if there is a death resulting, but there was not a prior felony drug conviction. Then you asserted that it was sort of... You moved on from there that the case is supporting that? The best evidence of that, Your Honor, is the combination of the indictment and the model jury instructions, which is what Mathis tells us to look to to determine whether or not a statute is divisible. I believe that is supported by Kentucky case law. Kentucky case law has recently in Johnson, the Supreme Court reiterated that the controlled substances statute passes the Blockberger test with respect to the type of substance involved. This court in Raja versus Sessions said, you can't have a finding like that. You can't find that it passes Blockberger and also find that the statute is indivisible. Those are mutually inconsistent theories. And so I think that that confirms what the unchanging model jury instructions indicate, which is that the type of controlled substance is an element of the offense. So it's not a question of interpreting the statute, it seems like you're implying. I mean, because if you look at the statute when we're just talking about, you know, like certain serious drug offenses or something, it would seem like the jury wouldn't have to make a particular finding, but as to the type of drug. Yeah, I mean, as a matter of just the statutory text, but if there's this sort of custom around it in the form of jury instructions and that prevails, is that kind of the way this works? Well, I would disagree that there's nothing in the statutory text that leads to this conclusion, because in fact, Johnson looked to the statutory text on questioning whether or not it passed Blockberger. Certainly, the statute does not set out each drug as its own specific subsection, which you often see in divisible statutes. You'll see 1A, 1B, 1C, 1D. But of course, and that would tell you that it's likely divisible, but that's not the end of the calculation. And there are many divisible statutes that are not set out into separate subsections like that. And in fact, other controlled substance statutes that this court has found to be divisible, I believe both Ohio and Pennsylvania, this court has found to be divisible. And they are similarly not set out, you know, A, cocaine, B, heroin, C, every single controlled substance in a subsection. All right. Well, you're over your time, and I don't want to, you know, I want to try to keep the time. Of course. Judge White or Judge Merritt, do you all have any further questions? No. Thank you. Okay. Thank you very much. We'll hear rebuttal, and we won't cut you off mid-sentence or anything here, Mr. Nash. Thank you, Your Honor. On that last point, Your Honor, about divisibility, I would like to point out that Judge White, in her dissent in the Beckstrom case, was precisely correct about the Kentucky statute issue. She found in her dissent that under Kentucky law, trafficking in multiple controlled substances on the same occasion was one crime, not two, which is an indication that the type of controlled substance is not, in fact, an element. And then the year after Judge White's dissent, Johnson, the Kentucky Supreme Court, Johnson came and said Judge White was right. She correctly interpreted our law, and they went on, as opposing counsel said, then to change the law at that point in 2018. But that's not the state of the law when my client was convicted way back in 2004. At that time, the statute was clearly divisible, as is also evidenced by the fact that the same punishment applies no matter the controlled substance that a person is convicted of trafficking in. Opposing counsel mentioned the Chapman case, Your Honor, in regards to the idea that it is not a violation of due process or equal protection to give defendants who are not similarly situated the same sentence. But that's not what we have here. In our case, we have defendants getting vastly different sentences who are situated in a way where the most culpable gets the least sentence, and the least culpable gets the most sentence. So it's not Chapman. And then... Well, the most culpable, like Judge White said, I mean, the most culpable is going to get the same sentence anyway. I mean, the government is not going to just go down with the ship in a different provision with a greater drug quantity because they don't fit something in that greater drug quantity provision. I mean, they're just going to go to this provision and give the guy life on this provision. Well, that's assuming that this court upholds that provision. My argument is is that provision is not constitutional, given the structure of the rest of the statute. And if that ruling is made by this court, then the government can't resort to that provision and achieve this upside down result. Okay. Now, just as a matter of the record, it does appear that Mr. Hickson did not object to the guideline range of life in the district court, as opposed to the mandatory minimum. Is that fair? It is fair to a point, Your Honor. The guidelines... So our argument is that count two should be thrown out altogether. There was no guideline calculation at all in the pre-sentence report made as to count one. So there was nothing to object to. And as to a count... And even if count two would have been postulated without the death results, without the prior felony, there was no guideline calculation made there either. The pre-sentence report totally presumed that this was going to be a life sentence case, and that's what we objected to. Okay. All right. What did you say about the fact that the judge was pretty clear that, you know, with or without it, he was going to give him life? Yes. So that's our substantive unreasonable argument. Judge Kethledge earlier said, you know, doesn't everybody just get a life sentence when a death results? And in fact, that's not the case. We cited other cases, some more culpable than Mr. Hickson, where a life sentence was not imposed. And so our argument on that point, Your Honor, is that simply imposing a life sentence every time the death results is a substantively unreasonable result. But it's not every time. I mean, a district judge would probably be within his or her discretion to say, you know, if you sell drugs that kill somebody, particularly with fentanyl, given the damage that's doing to our society, you know, the default might be you get life, unless there's a good reason not to sentence you in particular. And Judge Reeves cited some reasons why he was not the exception to maybe a general rule that if you kill somebody dealing fentanyl in this time, in this opioid crisis, you should get life and people should know it. Because among other things, Mr. Hickson, I read the sentencing transcript. I mean, he had showed no remorse whatsoever, had nothing to say in allocution after the victim's family spoke. I mean, why isn't that a fair judgment on the part of the district judge? Your Honor, what I would assert the sentencing transcript shows is that Judge Reeves totally focused on the idea of a death. He didn't talk about the opioid crisis. He didn't talk about sort of fentanyl in general as a community problem. He focused solely on the death. And I think a fair reading of his ruling is, is that I'm going to give a life sentence whenever a death results. And we believe that's focusing in arbitrarily on a single sentencing factor, albeit a legitimate sentencing factor, without looking at the totality of the other sentencing factors. Okay. Any further questions? All right. Well, Mr. Nash, I see that you were appointed pursuant to the Criminal Justice Act. And on behalf of the panel, I want to thank you for your excellent service in this case. Your brief and your arguments here today were exemplary. And I'd also say the same about the government's representation. We appreciate your help, both of you.